# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Alliance Mortgage Investments, Inc., | ) | Case No. 07-10941 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 07-10942 (CSS) |
| Alliance Bancorp, | ) | |
| | ) | Objections Due: September 10, 2007 at Noon (ET) (Requested) |
| Debtor. | ) | |
| | ) | Hearing Date: September 12, 2007 (ET) (Requested) |

## MOTION OF WELLS FARGO BANK, N.A. PURSUANT TO 11 U.S.C. § 702 AND FED. R. BANKR. P. 2003 FOR AN ORDER RESOLVING DISPUTED ELECTION AND CONFIRMING ELECTION OF TRACY L. KLESTADT AS PERMANENT TRUSTEE

Wells Fargo Bank, N.A., as administrative and collateral agent (in such capacity, the "Agent"), on behalf of itself, as Agent, and the other lenders (collectively, the "Lenders") under that certain Term Loan Agreement, dated as of June 9, 2005, by and among the Agent, the Lenders and Alliance Mortgage Investments, Inc. ("AMI") (as amended, restated and/or modified from time to time, the "Loan Agreement"), hereby files this motion (the "Motion"), pursuant to section 702 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order resolving the disputed election and confirming the election of Tracy L. Klestadt as permanent trustee in the chapter 7 cases of AMI and Alliance Bancorp ("AB" and together with AMI, the "Debtors"). The Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1. By this Motion, the Agent and the Lenders seek to exercise their statutory right to elect a permanent trustee. Under section 702 of the Bankruptcy Code, a candidate for trustee is elected if creditors holding at least 20% of eligible claims vote, and such candidate receives the majority of the claims voted. Here, the Agent and the Lenders, which hold fixed, liquidated and otherwise eligible unsecured claims in excess of 90% of the unsecured claims scheduled by and filed against the Debtors, exercised their right to elect Mr. Klestadt as chapter 7 trustee at the Meeting of Creditors (as defined below). Because Mr. Klestadt received the votes of the holders of a majority of the claims voted, Mr. Klestadt was properly elected trustee. Notwithstanding these facts, the U.S. Trustee takes the position that the Agent and the Lenders did not possess fixed and liquidated claims as of the Meeting of Creditors because it is possible that the Agent's and the Lenders' unsecured claims could increase depending on the value of the collateral underlying their secured claims. Moreover, the U.S. Trustee asserts that it could not be determined whether the Agent and the Lenders satisfied the 20% threshold for voting because all potential claims against the Debtors were not known at such time, even though unrefuted testimony at the Meeting of Creditors indicated that the Agent's and the Lenders' unsecured claims could not be less than 20% of the universe of unsecured claims against the Debtors. For the reasons discussed below, the U.S. Trustee's position is impractical and contrary to applicable law and its own procedures for conducting elections as set forth in the United States Trustee's Manual.

2. As the largest unsecured creditors in the Debtors' cases by an overwhelming margin, the Agent and the Lenders are intensely focused on ensuring that assets of the Debtors are liquidated at the highest possible value, and that potential claims and causes of

2

action are zealously prosecuted. For the reasons described below, however, the Agent and the Lenders have lost confidence in the ability of the Interim Trustee (as defined below) to realize these goals. Among other things, the Agent and the Lenders believe the Debtors may hold substantial claims against their sister company and current chapter 7 debtor United (as defined below), for whom the Interim Trustee is serving as permanent trustee with fiduciary duties to the unsecured creditors of United. Unless an independent trustee is appointed to pursue such claims and causes of action for the benefit of the Debtors' creditors, recoveries for the Debtors' unsecured creditors may be irreparably compromised.

3. For these and the other reasons discussed herein, the Agent and the Lenders respectfully request that the Court resolve the disputed election in their favor.

## BACKGROUND AND FACTS

4. **Commencement of Cases**. On July 13, 2007 (the "Petition Date"), each of Debtors and one of their affiliated companies, Alliance Bancorp, Inc. (formerly known as United Financial Mortgage Corp., and hereinafter referred to as "United"), filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). AB is a wholly-owned subsidiary of AMI, and AMI and United are both wholly-owned subsidiaries of ARH Mortgage, Inc., which is not a debtor.

5. On July 16, 2007, the United States Trustee's Office, pursuant to section 701 of the Bankruptcy Code, appointed Montague S. Claybrook to serve as interim trustee (the "Interim Trustee") in the Debtors' and United's chapter 7 cases. By notice dated the same date, a meeting of creditors under section 341(a) of the Bankruptcy Code (the "Meeting of Creditors") was scheduled for August 15, 2007.

3

6. **The Loan Agreement and Related Documents**. Pursuant to the Loan Agreement, the Lenders lent $96,000,000.00 to AMI in the form of term loans. All of AMI's obligations under the Loan Agreement were guaranteed by AB pursuant to that certain Guaranty, dated as of June 9, 2005, by AB in favor of the Agent (the "Guaranty"). In addition, (a) AMI entered into that certain Security and Pledge Agreement, dated as of June 9, 2005, by and among AMI and the Agent, and (b) AB entered into that certain Subsidiary Security and Pledge Agreement, dated as of June 9, 2005, by and among AB and the Agent (together, the "Security Agreements"), pursuant to which AMI and AB granted and pledged to the Agent, on behalf of the Lenders, security interests in substantially all of the assets of AMI and AB other than certain property identified therein, including mortgage loans, servicing rights and other mortgage-related assets pledged by the Debtors from time to time to their warehouse lenders.

7. Although no bar date for filing proofs of claim has been set, the Agent, on behalf of the Lenders, filed (a) proofs of claim in each of the Debtors' cases on August 14, 2007, which proofs of claim asserted secured and unsecured deficiency claims in the aggregate amount of $100,515,580.00 (the "Original Proofs of Claim"), and (b) at the request of the U.S. Trustee, amended proofs of claim in each of the Debtors' cases on August 15, 2007, which proofs of claim asserted a secured claim in the amount of $25,000,000.00 and an unsecured claim in the amount of $75,515,580.00 (the "Amended Proofs of Claim").[1] Neither the Debtors, the Interim Trustee nor the U.S. Trustee have disputed the validity of the Loan Agreement or the amounts of the loans made thereunder, and a representative of the Debtors acknowledged under oath at the Meeting of Creditors that there are no such disputes. See Transcript of Meeting of Creditors,

---

[1] Although it was clear given the small amount of assets securing the Agent's and the Lenders' secured claims that the vast majority of such claims would be undersecured, the U.S. Trustee requested that the Agent and the Lenders bifurcate their secured and unsecured claims, which they did in the manner reflected in the Amended Proofs of Claim.

4

pgs. 8 and 96-97.[2] As of August 15, 2007, no proofs of claim were filed against the Debtors other than the Original Proofs of Claim and the Amended Proofs of Claim. See Disputed Election Reports (as defined below) ¶ 10 ("It would appear that no other proofs of claim were filed in this case by any other creditors.").

8. **The Debtors' Schedules**. According to AMI's Schedules of Assets and Liabilities dated July 31, 2007 (the "AMI Schedules"), as of the Petition Date AMI's books and records reflected assets valued at $2,449.00, secured liabilities of $96,000,000 relating to indebtedness under the Loan Agreement,[3] and no unsecured nonpriority liabilities.

9. According to AB's Schedules of Assets and Liabilities dated July 31, 2007 (the "AB Schedules"), as of the Petition Date AB's books and records reflected assets valued at $136,046,371.20, an unknown amount of secured claims,[4] and unsecured nonpriority liabilities of $7,035,750.74. Schedule B35 of the AB Schedules further states that of the $136,046,371.20 of assets listed by AB, $118,032,310.00 are subject to the liens of certain warehouse lenders of the Debtors and are not subject to any liens of the Agent.

10. Thus, according to the AMI Schedules and the AB Schedules, there is not more than $18,016,510.20 in assets which secure the Debtors' obligations under the Security Agreements, thus rendering the Agent and the Lenders substantially undersecured. Mr. Sullivan

---

[2] A copy of the Transcript of the Meeting of Creditors (the "341 Transcript") is attached as Exhibit A hereto. The 341 Transcript was prepared by Veritext New York Reporting Company based on an audio recording of the Meeting of Creditors provided by the U.S. Trustee to counsel for the Agent.

[3] The difference between the $96,000,000.00 scheduled by the Debtors and the aggregate claim of $100,515,580.00 reflected in the Amended Proofs of Claim consists of unpaid interest and fees. At the Meeting of Creditors, Thomas Sullivan, the Debtors' former chief financial officer, confirmed that unpaid interest and fees as of the Petition Date would likely equal between $3 million and $5 million. See 341 Transcript, p. 95.

[4] According to Schedule D of the AB Schedules, Wells Fargo Bank is listed as a secured creditor under an unspecific warehouse credit facility possessing secured and unsecured deficiency claims in amounts unknown. At the Meeting of Creditors, however, Mr. Sullivan testified that Schedule D was inaccurate in that it should have listed Wells Fargo Bank in its capacity as Agent under the Loan Agreement and not as a lender under a warehouse creditor facility. See 341 Transcript, p. 71.

testified that the Agent's and the Lenders' claims were undersecured at the Meeting of Creditors. See 341 Transcript, pgs. 11, 97 and 99. Mr. Sullivan further confirmed that the market value of the assets reflected on the Debtors' schedules is not greater than their book value. See 341 Transcript, pgs. 93-94. Therefore, it is clear that the Agent and the Lenders hold unsecured deficiency claims of at least $75 million against each Debtor.

11. **The Meeting of Creditors**. On August 14, 2007, the Agent filed with the Bankruptcy Court and forwarded to the U.S. Trustee (a) Verified Statements of the Agent's counsel in accordance with Rule 2006 of the Bankruptcy Rules (the "Verified Statements"),[5] (b) powers of attorney pursuant to which the Agent authorized its counsel to vote for a trustee of the Debtors on behalf of itself and each Lender (the "Powers of Attorney"), and (c) proxies of Quadrangle Master Funding Ltd. ("Quadrangle"), Stonehill Institutional Partners, L.P. and Stonehill Offshore Partners Ltd. (together, "Stonehill"), each of which are Lenders under the Loan Agreement, pursuant to which Quadrangle and Stonehill authorized Allan S. Brilliant to vote for a trustee of the Debtors (the "Proxies").[6] Copies of the Verified Statements, Powers of Attorney and Proxies are attached as Exhibit F to the Disputed Election Reports.

12. The Meeting of Creditors was held on August 15, 2007. Thomas Sullivan, the Debtors' former chief financial officer, and Robert Hyatt, United's former chief financial officer, provided testimony on behalf of the Debtors and United. At the Meeting of Creditors, counsel for the Agent, on behalf of the Agent and the Lenders pursuant to the Powers of

---

[5] The U.S. Trustee questions whether the Verified Statements complied with Rule 2006(e) of the Bankruptcy Rules because they did not include a copy of a solicitation in accordance with Rule 2006(e)(1). See Disputed Election Reports ¶ 14, n.4. Given that it was Quadrangle and Stonehill who requested counsel to the Agent to submit the Proxies, there was no solicitation within the meaning of Rule 2006(e)(1). Moreover, Quadrangle and Stonehill each attended and voted at the Meeting of Creditors, thus mooting any issues regarding solicitation.

[6] As reflected in the Proxies and ballots submitted at the Meeting of Creditors, Stonehill holds a total claim against each Debtor of $44,367,921.97, of which $33,275,941.48 is unsecured, and Quadrangle holds a total claim against each Debtor of $19,833,333.00, of which $14,874,999.75 is unsecured.

Attorney, and Quadrangle and Stonehill, in their capacity as Lenders under the Loan Agreement, each moved for the election of a permanent trustee in the Debtors' cases, and cast ballots for the election of Mr. Klestadt as trustee. Copies of such ballots are attached as Exhibit E to the Disputed Election Reports. Although other creditors of the Debtors received notice of and attended the Meeting of Creditors, no other creditor of the Debtors opposed the nomination of Mr. Klestadt to serve as trustee, or voted for any other trustee.

13. **The Disputed Election Reports**. At the conclusion of the meeting, the U.S. Trustee determined, with respect to the Debtors' cases, that the election was disputed and continued the Meeting of Creditors to a date to be determined.[7] On August 23, 2007, the U.S. Trustee filed (a) its United States Trustee's Report of Disputed Election of Trustee in AMI's case (the "AMI Report"), and (b) its United States Trustee's Report of Disputed Election of Trustee in AB's case (the "AB Report" and together with the AMI Report, the "Disputed Election Reports"). In the AMI Report, the U.S. Trustee disputed whether the Agent and the Lenders could elect a permanent trustee on the basis that the Agent and the Lenders did not possess "fixed" and "liquidated" claims in accordance with section 702(a) of the Bankruptcy Code. The U.S. Trustee makes this argument notwithstanding that no other creditors are listed in the AMI Schedules, and in spite of her request that the Agent and the Lenders bifurcate their unsecured and secured claims as reflected in the Amended Proofs of Claim.

14. In the AB Report, the U.S. Trustee also disputed the fixed and liquidated nature of the Agent's and the Lenders' claims against AB notwithstanding the U.S. Trustee's request that the Agent and the Lenders bifurcate their claims. The U.S. Trustee further argued that the universe of unsecured claims against AB was not known as of the date of the Meeting of

---

[7] No creditor voted to elect a trustee for the United estate, and thus the Interim Trustee now serves as permanent trustee in the United case.

7

Creditors, thus rendering it impossible for the U.S. Trustee to determine whether the Agent's and the Lenders' unsecured claims exceed 20% of AB's unsecured claims in accordance with section 702(b) of the Bankruptcy Code.

15. For the reasons set forth below, the Agent and the Lenders believe they have satisfied all elements of section 702 and the applicable provisions of the Bankruptcy Rules in electing Mr. Klestadt. Thus, the Agent and the Lenders respectfully request that the Court approve the Motion such other and grant further relief as the Court deems appropriate.

## ARGUMENT

I. **The Election Should Be Resolved and Tracy L. Klestadt Should be Confirmed as Permanent Trustee**

A. The Agent's and the Lenders' Unsecured Claims are Fixed and Liquidated

16. A creditor is qualified to vote to elect a chapter 7 trustee under section 702 of the Bankruptcy Code if such creditor holds an "allowable, undisputed, fixed, liquidated, unsecured claim" of a kind entitled to distribution under sections 726(a)(2)-(4). According to the Disputed Election Reports, the U.S. Trustee disputes whether the Agent and the Lenders possess "fixed" and "liquidated" claims.

*(i)   The Unsecured Claims are Fixed*

17. The Bankruptcy Code does not define "fixed." However, section 101(5)(A) of the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," thus pairing opposing concepts. For example, "matured" is paired against "unmatured," and "disputed" is paired against "undisputed." It follows that "fixed" and "contingent" are paired together because they are opposites: "fixed" means not "contingent." See In re Klein, 110 B.R. 862, 871 (Bankr. N.D. Ill.

8

1990) ("A claim is 'fixed' under § 702(a)(1) so long as it is not a 'contingent' claim."), rev'd on other grounds, In re Klein, 118 B.R. 971 (N.D. Ill. 1990). A claim against a debtor is not contingent (i.e., fixed) where the debtor's liability is certain and not dependent on an intervening event. See Mazzeo v. United States, 131 F.3d 295, 302 (2d Cir. 1997).

18. The Agent's and the Lenders' claims are fixed because all of the events necessary to establish the Debtors' liability to these creditors—namely, money lent, interest accrued, and fees incurred—occurred in connection with the Loan Agreement prior to the Petition Date. The U.S. Trustee's argument that the Agent's and the Lenders' claims are not fixed ignores the fact that the Debtors' liability to the Agent and the Lenders is certain and not dependent on any intervening event, which is consistent with how courts have defined "fixed." Accordingly, the Agent's and the Lenders' claims are eligible for purposes of electing a trustee insofar as they are "fixed" within the meaning of section 702(a) of the Bankruptcy Code.[8]

*(ii)    The Unsecured Claims are Liquidated*

19. The question of whether a claim is "liquidated" relates to the amount of liability. See United States v. Verdunn, 89 F.3d 799, 802 (11th Cir. 1996); see also Mazzeo, 131 F.3d at 304 (the term "liquidated" refers to a "claim's value and the ease with which that value can be ascertained"). If the value of the claim is easily ascertainable and if the value does not depend on "a future exercise of discretion, not restricted by specific criteria," the claim is liquidated. Id. (quoting Verdunn, 89 F.3d at 802); see also In re Poague, 92 B.R. 659, 665 (Bankr. N.D. Tex 1988) ("A debt is liquidated if the amount due and the date on which it was

---

[8] Although the U.S. Trustee does not argue that the Agent's and the Lenders' claims against AB are contingent because they arise under the Guaranty, the Agent notes that all claims arising under the Guaranty are fixed because "all contingencies have already been resolved in favor of liability." See Klein, 110 B.R. at 872. Pursuant to Section 2.1 of the Guaranty, AB agreed that the "Guaranty constitutes a guaranty of payment when due and not of collection." AB further agreed in Section 2.1 that "it shall not be necessary or required that any Secured Party exercise any right, assert any claim or demand or enforce any remedy whatsoever . . . before or as a condition to the obligations of such Guarantor hereunder."

due is fixed and certain, or when they are ascertainable by reference to (1) an agreement or (2) a simple mathematical formula.").

20. In the context of determining whether a claim is "fixed" or "liquidated" for purposes of determining a creditor's right to call an election under section 702, courts also recognize the right of creditors to waive or limit portions of their security. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 379 (1988) (a "creditor is entitled to surrender or waive his security"). Upon waiving or limiting its security, a creditor may assert the resulting unsecured claim in the election of a trustee under section 702. See In re Lindell Drop Forge Co., 111 B.R. 137, 146 (Bankr. W.D. Mich. 1990) ("[I]f a secured creditor desires to participate in the election of a chapter 7 trustee, it may waive or limit the amount of the secured portion of its claim."). According to the United States Trustee Manual, the U.S. Trustee also subscribes to this principal. See United States Trustee Manual, § 2-1.6.8.1 n.5 ("undersecured creditors may bifurcate their secured and unsecured claims for purposes of requesting an election and voting under § 702").

21. The Agent and the Lenders possess unsecured claims against each Debtor in amount not less than $75,515,580.00, and such claims are fully liquidated independent of any determination as to whether the secured portion of the Agent's and the Lenders' claims exceed the value of the underlying collateral. The U.S. Trustee argues that the Agent's claims are not liquidated because the Agent and the Lenders—after bifurcating their claims at the U.S. Trustee's request—have asserted unsecured, nonpriority claims in the amount of $75,515,580.00, and secured claims in the amount of $25 million, the latter of which may include an unsecured deficiency claim depending on the value of the collateral against which the Agent may recover

pursuant to the Security Agreements.[9] This argument, however, ignores the dictates of the United States Trustee Manual and applicable law regarding the ability of creditors holding liquidated and unliquidated claims to vote for a chapter 7 trustee. See United States Trustee Manual, § 2-1.6.8.1 n.5 ("creditors with both liquidated and unliquidated claims may assert the liquidated portion of their claims for purposes of determining eligibility to vote for a chapter 7 trustee"); see also In re Klein 118 B.R. at 981 ("Section 702(a) does not expressly prevent a creditor from asserting the liquidated portion of its claim"). In Klein, the creditor seeking the election had both secured and unsecured, liquidated and unliquidated claims evidenced in its proof of claim. The District Court for the Northern District of Illinois held that section 702(a) does not prevent a creditor holding a claim that consists of both liquidated and unliquidated portions from asserting the liquidated portion of its claim for purposes of voting for a trustee. See id. In this case, the Agent and the Lenders have asserted fixed, liquidated, unsecured, nonpriority, unsecured claims in the amount of $75,515,580.00, and are thus entitled to elect a trustee in accordance with section 702.

    B.    The Lenders Hold More Than 20% of the Unsecured Claims Entitled to Vote

22. In addition to satisfying the requirements of section 702(a), creditors seeking the election of a permanent trustee must also satisfy the prerequisites of sections 702(b), which requires that creditors requesting an election hold at least 20% of the claims described in section 702(a). This calculation first requires the court to determine the "universe of claims" against which the voting creditor's share will be judged. To determine the universe of claims

---

[9] In the Disputed Election Reports, the U.S. Trustee actually argues that the Agent's and the Lenders' claims are not "fixed" because such claims may include an unsecured deficiency claim depending on the value of the collateral securing such claims. This argument, however, is really a contention as to whether the claims are "liquidated" and will be addressed as such. For the reasons noted above, the Agent's claims are fixed in light of their being no contingency with respect to the Debtors' liability.

eligible to vote, the United States Trustee Manual states that the total amount of unsecured claims without priority set forth on the summary page of the debtor's schedules should be used, see United States Trustee Manual, § 2-1.6.8.2, a principal to which nearly all courts subscribe. See e.g., In re Lindell Drop Forge Co., 111 B.R. at 145 ("the universe of claims for § 702(a) purposes should be first determined by relying upon a debtor's schedules"); see also In re Tartan Construction Co., 4 B.R. 655, 658-59 (Bankr. D. Neb. 1980); In re Michelex Ltd., 195 B.R. 993, 1006-10 (Bankr. W.D. Mich. 1996). Moreover, courts generally decline to speculate about the possible existence of additional claims where a debtor's schedules are filed prior to a section 341 meeting. See In re Poage, 92 B.R. at 664 (finding that speculation regarding the possibility of additional claims was not warranted where the claim vote exceeded 90% of scheduled unsecured claims); see also Comprehensive Accounting Corp. v. Pearson (In re Pearson), 773 F.2d 751, 756 (6th Cir. 1985) (finding that it is appropriate for a bankruptcy court to rely primarily on a debtor's schedules if the schedules were made in good faith).

23. Under any of the formulas used by courts to determine the universe of eligible claims, the Agent's unsecured, nonpriority claims easily surpass the 20% threshold to qualify to call for the election of a trustee. The method used by the court in Michelex begins by (a) referring to unsecured nonpriority claims scheduled by the debtor, (b) then subtracts those listed as disputed, contingent, or unliquidated, (c) then adjusts those debts by incorporating the filed proofs of claim, and (d) then finally subtracts those claims disqualified by section 702(a) of the Bankruptcy Code.[10] See In re Michelex, 195 B.R. at 1006-09.

24. The result of applying the Michelex formula to AMI demonstrates that the Agent's and the Lenders' unsecured claims exceed the 20% threshold. The AMI Schedules state

---

[10] The formula used by the court in Michelex is also the formula which the U.S. Trustee states she would use in determining whether the Agent and the Lenders held a sufficient amount of unsecured claims to elect a trustee. See AMI Report ¶ 21 and AB Report ¶ 24.

12

that there are no unsecured, nonpriority claims outstanding against it. The Agent, however, filed the Amended Proofs of Claim asserting unsecured, nonpriority claims of $75,515,580.00, which exceeds 20% of scheduled and filed unsecured claims. The Agent, Stonehill, Quadrangle and the other Lenders were the only creditors of AMI to move for the election of a permanent trustee and vote for Mr. Klestadt, and thus it is indisputable that Mr. Klestadt received a majority of the votes cast. Accordingly, Mr. Klestadt should be appointed as permanent chapter 7 trustee for AMI.

25. Applying the <u>Michelex</u> formula to AB yields the same result. The AB Schedules state unsecured, nonpriority claims equal to $7,035,750.74. In addition, the Agent filed the Amended Proofs of Claim asserting unsecured, nonpriority claims of $75,515,580.00, resulting in an aggregate unsecured claim pool of $82,551,330.74. None of the claims in the AB Schedules were listed as disputed, contingent, or unliquidated,[11] and none appear to be disqualified by section 702(a). Thus, under section 702(b), to call an election unsecured creditors would need to hold at least $16,510,266.15 (20% of $82,551,330.74) in unsecured claims. The unsecured claims held by the Agent exceed *91%* of AB's scheduled unsecured claims as adjusted in accordance with <u>Michelex</u>, easily surpassing the 20% threshold. The Agent, Stonehill, Quadrangle and the other Lenders were the only creditors of AB to move for the election of a permanent trustee and voted for Mr. Klestadt, and thus it is indisputable that Mr. Klestadt received a majority of the votes cast. Accordingly, Mr. Klestadt should be appointed as permanent chapter 7 trustee for AB.

26. Notwithstanding that the Agent's and the Lenders' unsecured claims easily exceed 20% of the unsecured claims scheduled by and filed against the Debtors, the U.S.

---

[11] The "Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements" in the AB Schedules states that AB reserves its right to, among other things, subsequently designate any scheduled claim as disputed, contingent or unliquidated.

Trustee argues that the 20% requirement can not be satisfied. The U.S. Trustee contends that the amount of unsecured claims is currently unknowable because of turmoil affecting the mortgage security markets, and the resulting effect on the value of collateral securing AB's other secured claims. See AB Report ¶¶ 17, 18. Thus, the U.S. Trustee maintains that because she can not quantify the universe of claims against AB, the Agent and the Lenders can not satisfy the 20% threshold. This position, however, fails to acknowledge the findings of numerous courts and the United States Trustee Manual, discussed *supra*, which indicate that a debtor's schedules and filed proofs of claim are determinative of whether a creditor has satisfied the 20% threshold. The U.S. Trustee's position also borders on the absurd because there is no plausible scenario in which the undersecured claims of AB's warehouse lenders could be large enough to render the Agent's unsecured claims less than 20% of all of AB's unsecured claims.[12] Mr. Sullivan testified at the Meeting of Creditors that the warehouse lenders' deficiency claims could not total more than $150 million, and suggested that the number was probably far lower. See 341 Transcript, p. 105. Moreover, many of AB's warehouse lenders have already foreclosed on their collateral and waived any potential deficiency claims against the Debtors. See Order Granting Relief from Stay, dated July 30, 2007 (Docket No. 44); Order Granting First Collateral Services, Inc. Relief from Stay, dated July 31, 2007 (Docket No. 62); Order Granting Relief from Stay, dated August 9, 2007 (Docket No. 87). Thus, in disputing the election, the U.S. Trustee has adopted a formulation of the rule for determining whether a creditor satisfies the 20% threshold that is contrary to judicial precedent, inconsistent with the U.S. Trustee's manual, and untenable in application.

---

[12] Total unsecured claims would need to exceed approximately $375 million for the Agent's and the Lenders' unsecured claims to fall short of the 20% threshold.

14

C. The Agent's and the Lenders' Interests are Not
Materially Adverse to Other Creditors

27. Although the U.S. Trustee does not appear to take the position that the Agent and the Lenders hold interests materially adverse to the estates, the U.S. Trustee does note that the Interim Trustee raised this issue at the Meeting of Creditors. See AB Report, n.6. The U.S. Trustee cites In re Jotan, 236 B.R. 79 (Bankr. M.D. Fla. 1999) for the proposition that an undersecured creditor should be ineligible to elect a chapter 7 trustee where such creditor may hold interests that are materially adverse to the interests of unsecured creditors. In Jotan, the court found that an undersecured creditor held an interest materially adverse to unsecured creditors because the undersecured creditor was concerned with maximizing its secured claim in the face of a challenge by the trustee to its secured status. See id. at 84. The trustee's challenge to the undersecured creditor's secured status created a conflict because "the general unsecured creditors would prefer [the undersecured creditor] be unsecured so unsecured creditors may receive some distribution." Id.

28. Here, there has never been a dispute as to the validity of the Agent's and the Lenders' secured claims, which were acknowledged by Mr. Sullivan at the Meeting of Creditors. See 341 Transcript, pgs. 8 and 96-97. Although the Agent and the Lenders have an interest in maximizing their recoveries against collateral pursuant to the Security Agreements, the Agent and the Lenders have not asserted a security interest in any assets other than those pledged to them under the Security Agreements. Given that the Agent's and the Lenders' claims are vastly undersecured, they will be aligned with other unsecured creditors in focusing on enlarging the asset pool from which distributions will be made for the benefit of all creditors. In that regard, it is noteworthy that on August 23, 2007, the Interim Trustee filed Notices of Abandonment with respect to certain property of the Debtors, abandoning to the Agent and the

Lenders substantially all of their collateral. Thus, any further recoveries in these cases are likely to be from assets that will be shared among the Agent, the Lenders and general unsecured creditors.

29. In addition, as discussed above, courts have routinely upheld a secured creditor's right to waive or limit a portion of its secured claim to become eligible to vote in the election of a chapter 7 trustee. See e.g., In re Lindell, 111 B.R. at 146. By bifurcating their claims at the request of the U.S. Trustee pursuant to the Amended Proofs of Claim, that is precisely what the Agent and the Lenders accomplished.

30. Finally, the policy behind the enactment of section 702 dictates that the Agent's and the Lenders' choice of trustee should be appointed. In Michelex, the court cited legislative history in explaining that the purpose of section 702 is to ensure creditor control in cases where there is true creditor interest. See In re Michelex, 195 B.R. at 1002 (citing H.R. Rep. No. 95-595). Here, the Agent and the Lenders are highly motivated to enhance recoveries on their unsecured claims, which are many times greater than the total amount of the Debtors' other unsecured claims. Their interest in maximizing recoveries is not diminished as a consequence of their holding a relatively small companion claim secured by property which the Interim Trustee has proposed to abandon to the Agent and the Lenders. To deny a creditor with so much at stake the ability to assert some measure of control over the proceedings by upholding its statutory rights to elect a permanent trustee is not only highly inequitable, but also undermines the purpose of allowing creditors to elect a trustee.

31. For all of the foregoing reasons, the Agent and the Lenders have satisfied each of the statutory conditions necessary to elect Mr. Klestadt as permanent trustee for the Debtors.

## II. An Independent Trustee For the AMI and AB Estates is Necessary to Preserve Value for the Debtors' Creditors

32. The Agent and the Lenders also believe that the appointment of a permanent trustee for the Debtors which is independent of United's trustee is critical for the purpose of maximizing recoveries. A crucial function of the Agent's, the Lenders' and other unsecured creditors' distributions in these cases will be the ability of the trustee to enlarge potential avenues of recovery, including the prosecution of fraudulent conveyance and preference actions against insiders of the Debtors and third parties who engaged in various transactions with the Debtors. Among those potential defendants is United, who was a co-borrower with AB under a certain Master Repurchase Agreement, dated as of August 29, 2001, by and among AB, United and Credit Suisse First Boston Mortgage Capital LLC. AMI and/or AB were also the purchasers of potentially billions of dollars of mortgage loans from United in the years preceding the Petition Date. In light of the possible size of these claims, it is vital that an independent fiduciary be appointment to pursue such claims against United for the benefit of creditors of the Debtors, and that such fiduciary have no competing loyalties to United's creditors. See In re BH & P Inc., 949 F.2d 1300, 1313 (3d Cir. 1991) (upholding bankruptcy court's appointment of a separate trustee for one estate to pursue claims against other estates which had been jointly administered by one trustee).

33. The Agent and the Lenders have also not been satisfied with the Interim Trustee's administration of the Debtors' cases to date. The Agent and the Lenders possess large unsecured claims and are highly motivated to increase their potential returns, which will inure to the benefit of all unsecured creditors. Given the alignment of the interests of the Agent, the Lenders, and unsecured creditors, the Agent and the Lenders reasonably expected the Interim Trustee and his professionals to be responsive to the concerns of the estates' largest creditors.

To that end, at the outset of these cases the Agent and the Lenders requested the Interim Trustee to provide them with a work plan summarizing their objectives for these cases, which included an analysis of potential fraudulent conveyance and preference actions by the Interim Trustee's proposed financial advisor, FTI Consulting ("FTI"). Despite repeated requests for the work plan, however, the Agent and the Lenders have not received a draft or any indication that a draft is in progress. Moreover, even though these cases were commenced well over six weeks ago, the Interim Trustee has not filed an application seeking approval of FTI's retention.[13]

34. In addition, counsel for the Agent and the Lenders have requested reasonable notice of proposed settlements between the Debtors' estates and third parties which affect the interests of unsecured creditors. Frequently, however, the Interim Trustee and his counsel have sought approval of settlements with little or no notice to the Agent and the Lenders.[14]

35. The Interim Trustee has also sought the approval of settlements which lacked appropriate protections for unsecured creditors. For instance, the Interim Trustee sought the approval of settlements of motions by the Debtors' warehouse lenders, such as First

---

[13] Indeed, the Interim Trustee only filed his application for the retention of his proposed counsel, Blank Rome LLP, on August 13, 2007, which requests that such retention be deemed *nunc pro tunc* to a date nearly a month prior to the date of such application. The Interim Trustee has also suggested that other professionals may be working on his behalf, but no other retention applications have been filed other than for the retention of Flaster Greenberg, P.C. to represent the Interim Trustee on certain matters where Blank Rome is conflicted.

[14] In one case, the Interim Trustee sought approval of various settlements with its landlords in the context of the Interim Trustee's motion to reject real property leases and abandon certain personal property (the "Property Abandonment Motion"). On the eve of the hearing to approve the Property Abandonment Motion, counsel to the Agent became aware that the Interim Trustee had reached an agreement with three landlords, each of which were affiliated with Mehrdad Elie, the Debtors' former chief executive officer and a substantial equity holder, to abandon personal property to the landlords affiliated with Mr. Elie immediately upon entry of the order approving the Property Abandonment Motion, as opposed to upon notice as proposed in the original order. As a result, the Agent was forced to object to the revised order at the August 22 hearing on grounds that it now contemplated immediate abandonment of property of the estate to an insider who potentially received fraudulent transfers and/or preferences prior to the Petition Date. The proposed order was eventually modified to make it more consistent with the original form of order.

Collateral Services, Inc., Residential Funding Company, LLC, and Comerica Bank, for relief from the automatic stay, in consideration for modest payments by the warehouse lenders not exceeding $50,000, and which permitted such lenders to preserve their deficiency claims. Although deficiency claim waivers were eventually included in such settlements, it was only after counsel for the Agent convinced the Interim Trustee that such waivers were necessary to protect unsecured creditors and limit protracted litigation over the size of deficiency claims at the conclusion of the Debtors' cases.

36. In light of these concerns and the potential conflicts among the Debtors and United, the Agent and the Lenders believe that the appointment of Mr. Klestadt as permanent trustee will better serve the interests of unsecured creditors of the Debtors.

### Conclusion

WHEREFORE, the Agent, on its own behalf and on behalf of the Lenders, respectfully requests that the Bankruptcy Court enter an order resolving the disputed election in its favor and confirming Tracy L. Klestadt as permanent chapter 7 trustee in the Debtors' cases, and granting the Agent such other relief as is just and proper.

Dated: Wilmington, Delaware  
August 31, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Gregory W. Werkheiser (No. 3553)  
Daniel B. Butz (No. 4227)  
1201 North Market Street  
Wilmington, DE 19801  
Phone: (302) 658-9200  
Facsimile: (302) 658-3989

- and -

GOODWIN PROCTER LLP
Allan S. Brilliant, Esquire
Brian W. Harvey, Esquire
599 Lexington Avenue
New York, NY 10022
Phone: (212) 813-8800

COUNSEL FOR WELLS FARGO BANK, N.A. AS AGENT